NEMAZEE, APPELLEE, *v.* MT. SINAI MEDICAL CENTER ET AL., APPELLANTS.

[Cite as Nemazee *v.* Mt. Sinai Medical Ctr. (1990), 56 Ohio St. 3d 109.]

(No. 89-1648—Submitted October 17, 1990—Decided December 19, 1990.)

110

*Robert E. Sweeney Co., L.P.A.,*
*Lawrence M. Oberdank, David P. Pav-*
*lik* and *Robert E. Davis,* for appellee.
*Hahn, Loeser & Parks, Pat E.*
*Morgenstern-Clarren, R. Steven*
*DeGeorge* and *Jeffrey D. Van Niel,* for
appellants.
*Bricker & Eckler* and *James J.*
*Hughes, Jr.,* urging reversal for

*amicus curiae,* Ohio Hospital Association.

*Arter & Hadden, Irene C. Keyse-Walker* and *Edward S. Jerse,* urging reversal for *amicus curiae,* Greater Cleveland Hospital Association.

ALICE ROBIE RESNICK, J. The issue before this court is whether a physician employed by a private hospital must, upon termination, exhaust the administrative remedies provided for in an employment contract prior to seeking judicial review. In other words, does the exhaustion-of-administrative-remedies doctrine apply to the internal review procedures of privately owned hospitals. Appellant contends that the doctrine does apply to privately owned hospitals and, hence, the trial court was correct in dismissing the action because appellee had failed to exhaust his administrative remedies. While appellee appears to concede that the exhaustion doctrine applies to staffing procedures for private hospitals, he asserts that this case falls within one of the recognized exceptions to the doctrine, *i.e.,* the "vain act" exception.[3]

We begin by summarizing the case law and general policies pertaining to the exhaustion-of-administrative-remedies doctrine. "It is a well-established principle of Ohio law that, prior to seeking court action in an administrative matter, the party must exhaust the available avenues of administrative relief through administrative appeal." *Noernberg* v. *Brook Park* (1980), 63 Ohio St. 2d 26, 29, 17 O.O. 3d 16, 18, 406 N.E. 2d 1095, 1097 (citing *State, ex rel. Lieux,* v. *Westlake* [1951], 154 Ohio St. 412, 43 O.O. 343, 96 N.E. 2d 414). In Ohio, the exhaustion-of-administrative-remedies doctrine is a court-made rule of judicial economy. See *G.S.T.* v. *Avon Lake* (1976), 48 Ohio St. 2d 63, 65, 2 O.O. 3d 217, 218, 357 N.E. 2d 38, 40. As the United States Supreme Court has stated, "[e]xhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Weinberger* v. *Salfi* (1975), 422 U.S. 749, 765. The purpose of the doctrine "* * * is to permit an administrative agency to apply its special expertise * * * and in developing a factual record without premature judicial intervention." *Southern Ohio Coal Co.* v. *Donovan* (C.A. 6, 1985), 774 F. 2d 693, 702. The judicial deference afforded administrative agencies is to

---

[3] Appellee also argues that the trial court erred by failing to articulate whether the motion to dismiss was granted under Civ. R. 12(B)(1) or under Civ. R. 12(B)(6). Although the proper procedure for a trial court is to clearly identify its ruling, we need not determine the basis on which the motion was granted to decide the issues in this case. The issues are the same under either Civ. R. 12(B)(1) or 12(B)(6). Appellee also contends that the trial court also erred by failing to convert the motion to dismiss to a motion for summary judgment if it in fact considered the four exhibits attached to the dismissal motion when determining the matter under Civ. R. 12(B)(6). A trial court has authority to consider any pertinent evidentiary materials when determining its own jurisdiction. See *Southgate Development Corp.* v. *Columbia Gas Transmission Corp.* (1976), 48 Ohio St. 2d 211, 2 O.O. 3d 393, 358 N.E. 2d 526, paragraph one of the syllabus. This ruling on jurisdiction (Civ. R. 12[B][1]) is also dispositive of the motion under Civ. R. 12(B)(6) in this case. Therefore, appellee's argument is without merit.

"* * * 'prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court * * *.' " *Ricci* v. *Chicago Mercantile Exchange* (1973), 409 U.S. 289, 306.

With these policies behind the exhaustion doctrine in mind, we proceed to an analysis of the issues in the case at bar. Initially, it must be noted that this case does not involve a governmental agency or any administrative procedures prescribed by statute. Rather, we are confronted by private parties who, by way of an employment contract, have established administrative procedures to deal with conflicts regarding hospital staff privileges. Thus, of necessity we must review the employment contract. Paragraph Seven of the employment contract is entitled "Termination and Discipline" and contains the following language:

"(c) *When it is determined through an evaluation process performed in accordance with the Due Process Policy,* as the same may be modified or amended from time to time, that the Physician is not meeting the standards of the Program and/or profession for reasons which include, but are not limited to, (1) professional incompetence with respect to carrying out his duties and responsibilities, (2) ethical or moral character of the Physician which is detrimental to MSMC's patients or employees, (3) conduct or action taken by the Physician in a matter which interferes with the delivery of quality patient care, or (4) demonstration by the Physician of an inability to work effectively with others, thereby adversely affecting the quality of patient care at MSMC[,] *disciplinary action which may result in termination will be pursued in accordance with the Due Process Policy.*" (Emphasis added.)

As can be seen, the employment agreement refers to a "Due Process Policy." This policy is designed to handle both academic and disciplinary actions, and sets forth in detail certain procedures and requirements. For example, the policy provides that residents shall be evaluated on a semiannual basis for academic, personal and professional development; that if they are not meeting the standards of the training program, they are to be notified of that fact; that such notice is to include specific measures that must be taken to correct the performance deemed substandard; and that the residents are to be re-evaluated within a prescribed period of time. The pertinent portion of the Due Process Policy provides as follows:

"4. If at the time of re-evaluation it is determined that the resident still has not met the standards of the training program and profession due to a failure or inability to comply with the corrective measures outlined in the notice, any of the following disciplinary measures may be invoked either singularly or in combination, where appropriate:

"a. The residency may be extended in increments of one month beyond the end of the contract year to assure that performance will meet the standards of the program which all residents at the same PGY level are expected to meet.

"b. The resident may be temporarily suspended from patient care responsibility pending identifiable progress in correcting deficiencies, such progress to be determined by observation, documentation, and/or verbal communication from a variety of sources either within or outside the hospital.

"c. The resident may be informed that his contract may not be renewed for the next postgraduate year.

"d. The resident may be dis-

missed prior to the termination of his contract.

"Written notice of adverse action shall be mailed or delivered to the resident within ten days of such action.

"5. Following the exhaustion of the above steps, the resident may request review of the matter by a hearing committee composed of the program director, a chief resident, and three other medical staff members of the department. The request shall be made in writing and shall be delivered to the program director within ten days following receipt of the written notice of adverse action. The program director, the resident being disciplined, and the president of the hospital shall each choose one of the medical staff members of the hearing committee. At the time of the hearing, the resident may present his case to the committee and provide documented evidence and oral testimony, including testimony of witnesses. The hearing shall be informal in that legal counsel shall not be permitted and the rules of evidence shall not influence testimony and documentation presented. In cases where the action of this committee falls short of dismissal, its decision shall be final and non-appealable. The decision shall be mailed or delivered to the resident within thirty days following the hearing.

"6. In cases where the disciplinary action of the hearing committee results in dismissal from a residency program, such action shall be presented to a subcommittee of the Joint Conference Committee for final disposition within thirty days following the written decision of the hearing committee. The subcommittee shall be composed of the three Joint Conference Committee members including its chairman, one medical staff member of the committee previously a member of the hearing committee, and one board of trustee member of the committee. They shall review the evidence previously submitted, and the only additional evidence accepted shall be a rebuttal statement supplied by the dismissed resident. Decisions rendered by subcommittee shall be deemed final and non-appealable."[4]

Ohio courts have long held that we should defer to the judgment of hospital administrators in matters relating to staffing privileges. The court in *Khan* v. *Suburban Community Hosp.* (1976), 45 Ohio St. 2d 39, 44, 74 O.O. 2d 56, 59, 340 N.E. 2d 398, 402, stated that "[t]he great weight of case authority in the United States is that a

---

[4] We note that this procedure as set forth above is analogous to an arbitration agreement. Arbitration is "the submission of some disputed matter to selected persons, and the substitution of their decision or award for the judgment of the established tribunals of justice, thus avoiding the formalities, the delay, and the expense of ordinary litigation. * * * Arbitration as a method of settling disputes and controversies was recognized at common law and has been favored by the courts of Ohio from early times. The courts are inclined to regard arbitration proceedings with great favor, because they tend to avoid litigation, and because it is the choice of the parties themselves that their differences be settled in this manner." 6 Ohio Jurisprudence 3d (1978) 6-7, Arbitration and Award, Sections 1-2. Another way of defining "arbitration" is to say it is "[a]n arrangement for taking and abiding by the judgment of selected persons in some disputed matter, instead of carrying it to established tribunals of justice, and is intended to avoid the formalities, the delay, the expense and vexation of ordinary litigation." Black's Law Dictionary (6 Ed. 1990) 105. Thus, while the parties have not expressly designated it as such, the Due Process Policy is much like an arbitration agreement.

board of trustees of a private hospital has the authority to appoint and remove members of the medical staff of the hospital and to exclude members of the medical profession in its discretion from practicing in the hospital. And, the action of hospital trustees in refusing to appoint a physician to its medical or surgical staff, or declining to renew an appointment that has expired or changing the requirements for staff privileges, is not subject to judicial review. * * *'' (Citations omitted.)

We have recently reaffirmed this position in *Bouquett* v. *St. Elizabeth Corp.* (1989), 43 Ohio St. 3d 50, 538 N.E. 2d 113. Therein, we stated at paragraph one of the syllabus:

"The board of trustees of a private hospital has broad discretion in determining who shall be permitted to have staff privileges. Courts should not interfere with the exercise of this discretion unless the hospital has acted in an arbitrary, capricious, or unreasonable manner or, in other words, has abused its discretion. * * *''

The majority of courts in other jurisdictions which have considered this issue have found that the exhaustion doctrine is applicable to the administration of private hospitals. See *Westlake Community Hosp.* v. *Superior Court* (1976), 17 Cal. 3d 465, 131 Cal. Rptr. 90, 551 P. 2d 410; *Garrow* v. *Elizabeth Gen. Hosp. & Dispensary* (1979), 79 N.J. 549, 401 A. 2d 533; *Eidelson* v. *Archer* (Alaska 1982), 645 P. 2d 171. In addition, the federal courts which have addressed this issue have also held that a physician in a private hospital whose hospital privileges have been terminated is required to exhaust the hospital's internal administrative remedies before seeking judicial relief. See *Brooks* v. *Arlington Hosp. Assn.* (C.A. 4, 1988), 850 F. 2d 191; *Qasem* v. *Kozarek* (C.A. 7, 1983),

716 F. 2d 1172; *Shulman* v. *Washington Hosp. Ctr.* (C.A.D.C. 1965), 348 F. 2d 70.

Based upon our previous rulings regarding the role of the courts in hospital staffing decisions and the persuasive reasoning from other jurisdictions, we hold that a physician in a private hospital whose employment and/or hospital privileges have been terminated must exhaust all internal administrative remedies provided by a hospital's charter, bylaws, rules, regulations and employment contract prior to seeking judicial review. Thus, in this case, appellee must first avail himself of the administrative remedies referred to in his employment contract prior to seeking judicial review. Our ruling is consistent with the purposes of the exhaustion doctrine, to wit: to afford the hospital the ability to correct its own errors; to provide a trial court with an adequate factual record upon which to make an informed decision as established by the expert testimony of the medical staff; and to promote judicial economy through the resolution of these disputes without the premature need for judicial intervention.

Having found that the exhaustion-of-administrative-remedies doctrine applies to privately owned hospitals does not end our inquiry. Rather, appellee asserts that the exhaustion doctrine should have been waived under the "vain act" exception. His contention is based on two grounds. First, he suggests that because the review committees were to be comprised of hospital administrators and staff members, he would have little or no chance of receiving a fair hearing due to their obvious bias. The bias appellee alludes to is the economic relationship between the hospital and the members of review committees. Second, appellee argues that he could not obtain com-

plete relief, since the Due Process Policy hearings would not award him the compensatory and punitive damages he sought. Appellee asserts that the review process would be an "absolute exercise in futility." Hence, appellee contends pursuing any administrative remedy would be a vain act.

When considering what constituted a "vain act," the court in *Gates Mills Investment Co.* v. *Pepper Pike* (1978), 59 Ohio App. 2d 155, 167, 13 O.O. 3d 191, 198, 392 N.E. 2d 1316, 1324, stated as follows: "A vain act is defined in the context of lack of authority to grant administrative relief and not in the sense of lack of probability that the application for administrative relief will be granted." We agree with this definition. Thus, a "vain act" occurs when an administrative body lacks the authority to grant the relief sought; a vain act does not entail the petitioner's probability of receiving the remedy. The focus is on the *power* of the administrative body to afford the requested relief, and not on the happenstance of the relief being granted. Hence, appellee's participation in appellant's administrative process would constitute a vain act only if the administrative body had no *authority* to grant the relief he sought.

None of appellee's arguments questions the *authority* of the hospital's review process to grant him the relief he requested. Rather, appellee's argument relating to bias goes to the probability of receiving the remedy he sought. Indeed, at oral argument appellee admitted that the hospital's hearing panel could have ordered reinstatement with back pay if it were warranted. Likewise, appellee's assertion that he could not have recovered punitive damages is not dispositive. While the hospital's Due Process Policy cannot grant punitive damages, we cannot allow appellee to circumvent the internal review procedures of the hospital simply by adding a claim for punitive damages. If this court were to do so, we would, in effect, be creating an entirely new exception to the exhaustion doctrine. This we are not prepared to do.

Thus, we hold that appellee must exhaust all internal administrative remedies as provided for in his employment contract prior to seeking judicial review. Moreover, under our definition of a "vain act" as set forth above, appellee has not established this exception to the exhaustion doctrine. For these reasons, the court of appeals' decision is reversed.

*Judgment reversed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.