DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from the Lucas County Court of Common Pleas' decision denying relief to appellant, Kathy Grine, on behalf of her son, Adam Grine. Appellant requested that two suspensions given to Adam be expunged from his record and that she be awarded costs and attorney fees for pursuing the appeals. The court found that the two suspension decisions were Constitutional and supported by the preponderance of substantial, reliable, and probative evidence in the record. The court further found that appellant had failed to exhaust her administrative remedies before appealing in a civil court action. For the reasons that follow, we reverse the decision of the trial court.
 {¶ 2} Appellant asserts the following errors on appeal:
 {¶ 3} "I. The trial court erred in finding in its May 7, 2004 Order that the suspension decisions are not unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the record.
 {¶ 4} "II. The trial court erred in its May 7, 2004 Order in finding that Appellant failed to exhaust her administrative remedies."
 {¶ 5} The following facts are relevant to this appeal. Adam Grine, a nine-year old with Asperger's Syndrome,[1] is a student in the Sylvania Public School District. As a student with a disability, Adam is covered by the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. 1400 et. seq.
 {¶ 6} The IDEA "confers upon disabled students an enforceable substantive right to public education * * *." Honig v. Doe
(1988), 484 U.S. 305, 310. The IDEA requires states to create regulations and policies that assure disabled children of the right to a "free appropriate public education" ("FAPE") in the "least restrictive environment." 20 U.S.C. 1412(1), (5). To ensure an appropriate education, the parents of disabled students, teachers, student services personnel, and school administrators, work together to create a written Individualized Education Plan ("IEP"). An IEP's purpose is to tailor a student's educational placement to the specific needs of that student's disability. The modifications, learning and behavior goals, and supports listed in an IEP become the "rules" by which students, teachers, and school personnel must abide. The IEP is also part of the student's "current educational placement." If an IEP states that a modification, aid, or student service is necessary to aid the disabled student, then it must be given. O.A.C. 3301-51-07(L)(1).
 {¶ 7} In accordance with his IEP, Adam is educated in regular education classrooms. Adam receives several services necessary to provide him with FAPE, including a full-time paraprofessional, a special education teacher who serves as case manager, and a separate quiet space in which Adam can take five minute breaks from class to calm down when frustrated or anxious. It is undisputed that, on two separate occasions, Adam was suspended from school as a consequence for certain behaviors. The parties disagree on facts surrounding the circumstances of the suspensions, and whether the behavior which prompted the discipline was the result of consciously chosen behavior on Adam's part or whether, as appellant alleges, school personnel's failure to provide the supports required by Adam's IEP provoked Adam into an episode caused by his disability, whereby he reacted inappropriately.
 The First Suspension {¶ 8} The first suspension occurred on February 11, 2003. According to appellant, Adam was afraid to go to school that day because of ongoing friction between him and his Intervention Specialist. Adam's IEP required teachers and school personnel to give Adam a "break" in a quiet room alone where he could calm down when he was experiencing particularly high levels of frustration or anxiety. On February 11, Adam requested a break. The parties' versions of the facts diverge at this point. Appellee points to Adam's IEP, which states that if Adam runs out of the classroom without requesting a break, then the teacher is to give Adam one minute to comply with instructions. If he does not, then his mother is called to take him home for the day. The consequence of being sent home for the day is most clearly outlined in the IEP section labeled "Crisis Intervention." However, neither party states that Adam ran out of the room; both parties agree that Adam had been given a choice of rooms in which to take his break, and Adam could not choose between them in his anxiety and frustration. Regardless, Adam's emotional level escalated, and he ran to the office of Robert Biglin, the principal of Stranahan Elementary.
 {¶ 9} Another Intervention Specialist followed Adam to Biglin's office. The office was empty except for Adam and the specialist. Adam asked to call his mother, which appellant states Adam was allowed to do. At this point the parties' factual versions also diverge. Both parties do agree that at some point in the office, Adam headbutted the specialist. Adam's mother was called, and Adam went home from school for the day. Adam's attendance record reflects this incident with the one-word label "dismissed."
 {¶ 10} Biglin, Adam's principal, telephoned Adam and appellant at home in the hour after school that same day. Both Adam and appellant picked up the phone on separate extensions. Biglin asked Adam directly what had happened at school. Adam told his version of the story. In the subsequent administrative appeal hearing, Biglin stated that he did not tell Adam that he was considering suspending Adam prior to the phone call. Biglin also stated that Adam admitted head-butting the specialist. Biglin then told appellant, on the phone, that he was going to suspend Adam and that appellant would have to come into the school office to pick up some forms. Appellant and Adam arrived within 15 minutes, and Biglin gave appellant suspension forms. Adam was suspended under Sylvania Schools Board Policy 5600F: Threat to Do Harm. Appellant subsequently filed an administrative appeal.
 The Second Suspension {¶ 11} The second suspension occurred one month later, on March 11, 2003. Due to icy conditions, all students were restricted to the blacktop area during recess. Adam ventured on an icy area of the blacktop, and was told to get off. When Adam did not respond, he was given one minute to comply. At the end of the minute, Adam was not off the ice. Adam was told that his mother would be called and he would be sent home for the day. The parties disagree as to whether Adam ran to the office without permission or whether he was taken there; regardless, once in the office, Adam wanted to call his mother. His request was again denied. He then grabbed the blouse of an office worker to get her to give him the phone. Both parties agree that Adam had not touched the office worker, or anyone else, in any other way. Both parties also agree that at that point, Adam was physically restrained. Adam's IEP allowed Adam to be physically restrained only in "crisis" situations and as a "last resort."
 {¶ 12} Appellant was already en route to the school to pick Adam up for the day. Here the parties' factual accounts again diverge. Biglin testified at the administrative hearing that, when appellant arrived at the office, he did not tell her or Adam that he was considering a suspension. He asked Adam to tell his version of events. Adam would not speak. Biglin then testified that appellant took Adam home. When asked whether Adam or appellant knew that a suspension was being considered during the in-office informal interview, Biglin testified, "if I predetermine that a suspension is called for, it doesn't make any sense [to tell the student]. I do want to hear from the student what his side of the story is. * * * I don't think I told him [that I was considering suspension]." Later that same evening, Biglin took the suspension forms to appellant at her home. Adam was again suspended under Section 5600F: Threat to Do Harm.
 {¶ 13} Although the parties disagree on whether appellant timely requested an administrative appeal, a hearing was held on June 10, 2003, three months after the second suspension decision. The appeals of both suspensions were heard simultaneously. Appellant argued that Adam's due process rights were violated when Biglin failed to follow appellee board's policy 5611. Appellant also argued that because Adam was dismissed more than ten school days that year, the school was required not to enact a suspension until a manifestation determination was held pursuant to IDEA rules. Mr. Carl Schultz, the Director of Student Services, served as the hearing officer. Biglin was the only other school administrator in attendance. Appellant was accompanied by her attorney and an Ability Center Parent Advocate. Appellant introduced extensive evidence of Asperger's Syndrome, Adam's performance in school and his performance pursuant to his IEP. Biglin submitted Adam's attendance record, and he testified as to the substance of both incidents gathered from his interviews with the school personnel involved.
 {¶ 14} Appellant was notified of the appeal decision the next day, June 11, 2003, via a telephone call. Although a single hearing was held in conjunction with both suspension appeals, two separate written appeal decisions ("appeal decisions") were issued. Both appeal decisions recite factual testimony and evidence from the hearing. The first suspension was upheld in its entirety. The second suspension was upheld with the modification that the second day of the two-day suspension would be erased from Adam's record, since the school was closed that day due to weather. Appellant subsequently notified the Sylvania Board of Education of her intention to appeal the hearing officer's decision to the court of common pleas.
 {¶ 15} If an appellant appeals to state or federal court from an administrative decision, but has not exhausted the administrative agency's internal appeals process, then the state or federal court will lack jurisdiction to hear the appeal. R.C. 256.01. Since we would be without jurisdiction to determine the first assignment of error, we will address the exhaustion issue first.
 I. {¶ 16} Appellant argues in her second assignment that she had exhausted all of the administrative remedies available in order to appeal the hearing officer's decision to a state trial court. Appellee argues, and the trial court agreed, that since the appeal decisions directed appellant to further appeal to the superintendent, appellant's remedies were not exhausted.
 {¶ 17} The doctrine of exhaustion of administrative remedies is well-established. Nemazee v. Mt Sinai Medical Center (1990),56 Ohio St.3d 109, 111. The IDEA also requires exhaustion of administrative remedies before filing a civil action. Proper construction of 20 U.S.C. 1415, IDEA's due process statute, is that state substantive law prescribes determinations to be made at a due process hearing, and states have the right to enforce their own laws and regulations at due process hearings authorized by 20 U.S.C. 1415, as well as skeletal federal provisions designed as minimum standards. Burlington v. Department of Educ.
(1984), 736 F.2d 773, affirmed by (1985) 471 U.S. 359. Thus, Ohio statutes and the Ohio Administrative Code provide further due process requirements, and a detailed administrative review and appeals process for IDEA-covered students. 20 U.S.C. 1415(f);20 U.S.C. 1415(l).
 {¶ 18} An exception to the requirement that remedies be exhausted exists when and if the plaintiff can establish that the agency has adopted an unlawful general policy which would make resort to the administrative remedies futile, or that the administrative remedies would fail to provide relief. Honig v.Doe (1988), 484 U.S. 305, 327. In addition, an exception to the exhaustion requirement has been found where the guardians of a child were not given full notice, as required by the IDEA, of their procedural rights. Doe ex rel. Gonzales v. Maher (1986),793 F.2d 1470, 1490-91; 20 U.S.C. § 1415(b). The burden of demonstrating that administrative procedures would be futile falls on the party seeking to avoid them. Crocker v. TennesseeSecondary School Athletic Ass'n (1989), 873 F.2d 933, 936-937.
 {¶ 19} Resolution of the exhaustion issue is only superficially facile. The matter is complicated by the intervening issue of whether Adam's status under the IDEA is implicated in each suspension decision and the subsequent appeals process. There are separate review and appeals processes, each with distinct due process safeguards, when a school suspends a student covered by the IDEA or suspends a non-covered student. A relevant Congressional finding recognized that one purpose of the IDEA is to "create school-based disciplinary strategies that will be used to reduce or eliminate the need to use suspension and expulsion as disciplinary options for children with disabilities." 20 U.S.C. 1451(a)(6)(H). Thus, the IDEA provides stricter due process requirements if and when a child's disability is implicated in his discipline.
 {¶ 20} The IDEA recognizes that schools have disciplinary rules applicable to all students, and thus permits schools to discipline a student with a disability as it would a non-disabled student, without providing the student with an alternative education setting. 20 U.S.C. 1415(k)(1)(A)(i). However, if discipline constitutes a "change of placement" for the disabled student as defined under the applicable regulations, then additional procedural safeguards are warranted. A "change of placement" occurs if a school disciplines a student by removing him for more than ten consecutive school days, or if a student is "subjected to a series of removals that constitute a pattern because they cumulate to more than 10 school days in a school year, and because of factors such as the length of each removal, the total amount of time the child is removed, and the proximity of the removals to one another." 34 C.F.R. 300.519; O.A.C. 3301-51-05(K). Therefore, once a disabled student is removed from school such as to constitute a "change of placement", even if a disabled student's behavior is found to be such as to require disciplinary suspensions, the due process safeguards in IDEA and the Ohio Administrative Code which pertain to disabled students apply. An "additional set of procedural protections kicks in to protect the child." Farrin v. Maine School Admin. Dist. (2001),165 F. Supp.2d 37, 42.
 {¶ 21} The hearing record incorporates Adam's attendance data for the 2002-2003 school year. From October 2002 to March 2003, Adam was "dismissed" 13 times, including the two suspensions at issue. Therefore, a threshold question is whether, and at what point, the dismissals constitute a change in placement which would initiate distinctly different procedures and distinctly different standards under which the suspensions must be evaluated.
 {¶ 22} Appellee contends that, where a disabled student is removed from school in accordance with an agreed upon plan established in the student's IEP, then there is no unilateral exclusion, and hence, no change in placement warranting separate procedures. Appellant argued at the initial appeal hearing, and continues to argue on appeal that a manifestation determination is warranted because of the removals, and that appellee erroneously treated both suspension decisions as if Adam were non-disabled.
 {¶ 23} Adam's attendance record, a computer-generated compilation from appellee's records, only indicates days on which Adam was "dismissed," and does not differentiate between types of dismissals. The hearing decision states that the "majority" of the dismissals were for "behavioral issues." Adam's IEP states in relevant part, "[p]hysical aggression, (actual contact such as a hit, kick) toward a teacher results in dismissal from school for the day." But Adam was also dismissed for non-compliance with verbal orders. We have found no case law that interprets34 C.F.R. 300.519 in a way that limits "removals" to "suspensions." Construing appellee's record of Adam's attendance in a light most favorable to appellant, appellee's use of the term "dismissal" equals a "removal" for purposes of determining whether a change of placement has occurred pursuant to 34 C.F.R. 300.519. Therefore, Adam was effectively "removed" from his current educational placement, a regular classroom with modifications and supports, when he was "dismissed" from school and sent home for behavioral problems.[2] This interpretation is supported by OAC 3301-51-01(J), which states, "`School day' means any day, including a partial day, that children are in attendance at school for instructional purposes. `School day' has the same meaning for all children in school, including children with and without disabilities." OAC Ann. 3301-51-01(J)(3).
 {¶ 24} No change of placement occurred as of the February 11, 2003 suspension, since Adam had not been removed for more than ten days that school year. A change of placement did occur, however, with the March 11, 2003 suspension, since at that point, Adam had been "dismissed" from school, and "removed" from his educational placement, more than ten school days.
 {¶ 25} Since a suspension that equals a change in a disabled student's educational placement is governed by different due process standards and additional safeguards, we will address each suspension decision separately. For each suspension decision, we will first consider whether appellant has exhausted her administrative remedies. Then, if appellant has exhausted her administrative remedies, and since the trial court considered the due process issue on the merits, we will consider whether each suspension decision was well-founded on the merits.
 II. The First Suspension {¶ 26} The United States Supreme Court has once rebuked Ohio's education system for failing to safeguard the due process rights of its students. "Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend. Those young people do not `shed their constitutional rights' at the schoolhouse door. Tinker v. DesMoines School Dist., 393 U.S. 503, 506 (1969)." Goss v. Lopez
(1975), 419 U.S. 565, 574.
 {¶ 27} In Goss, the United States Supreme Court addressed a former Ohio statute which allowed public school officials to impose suspensions of less than ten days without due process protections. After ruling that students facing even temporary suspensions have property and liberty interests that qualify for protection under the Due Process Clause of the Fourteenth Amendment, the Court held the Ohio statute violated those interests. Then, the court determined what amount of process is due when a student faces suspensions of less than ten days. At a minimum, even a temporary deprivation of a student's property interest in his education must be preceded by notice and an opportunity to be heard. Id. at 577. As to the amount of notice and hearing, given the necessity of school officials to ensure discipline and an atmosphere conducive to learning for all students, the court stated, "there need be no delay between the time `notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." Id. at 582. Moreover, and most pertinent here, is the long-standing rule of due process that requires notice to be given before the hearing occurs, or in the case of school suspensions, that notice of an intention to suspend be given in conjunction with a hearing. "`Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' Baldwin v.Hale, 1 Wall. 223, 233 (1864)." Id. at 579.
 {¶ 28} Subsequent to Goss v. Lopez, Ohio enacted R.C.3313.66, requiring school officials to give students written
notice of an intention to suspend and an informal hearing before imposing suspension as a disciplinary consequence, in addition to providing for an administrative appeal of suspension decisions. R.C. 3313.66 states in relevant part:
 {¶ 29} "Suspension, expulsion or permanent exclusion; removal from curricular or extracurricular activities.
 {¶ 30} "(A) Except as provided under division (B)(2) of this section, the superintendent * * * or the principal of a public school may suspend a pupil from school for not more than ten school days. The board of education * * * may adopt a policy granting assistant principals and other administrators the authority to suspend a pupil from school for a period of time as specified in the policy of the board of education, not to exceed ten school days. * * * Except in the case of a pupil given an in-school suspension, no pupil shall be suspended unless prior to the suspension such superintendent or principal does both of the following:
 {¶ 31} "1) Gives the pupil written notice of the intention to suspend the pupil and the reasons for the intended suspension * * *;
 {¶ 32} "(2) Provides the pupil an opportunity to appear at an informal hearing before the principal, assistant principal, superintendent, or superintendent's designee and challenge the reason for the intended suspension or otherwise to explain the pupil's actions.
 {¶ 33} * *
 {¶ 34} "(E) A pupil or the pupil's parent, guardian, or custodian may appeal the pupil's expulsion by a superintendent or suspension by a superintendent, principal, assistant principal, or other administrator to the board of education or to itsdesignee. The pupil or the pupil's parent, guardian, or custodian may be represented in all appeal proceedings and shall be granted a hearing before the board or its designee in order to be heard against the suspension or expulsion. * * * The board, * * * or by the action of its designee, may affirm the order of suspension or expulsion, reinstate the pupil, or otherwise reverse, vacate, or modify the order of suspension or expulsion.
 {¶ 35} "The board or its designee shall make a verbatim record of hearings held under this division. The decisions of the board or its designee may be appealed under Chapter 2506 of the Revised Code." R.C. 3313.66(A); 3313.66(E). (Emphasis added.)
 {¶ 36} The appeals process for administrative decisions is governed by R.C. 2506.01. The statute clearly allows for an appeal to a court of common pleas from an administrative decision. The statute states in relevant part, "Every final order, adjudication, or decision of any * * * board * * * may be reviewed by the court of common pleas of the county * * *. A `final order, adjudication, or decision' means an order, adjudication, or decision that determines legal rights, duties, privileges, benefits, or legal relationships of a person, but does not include any order, adjudication, or decision from which an appeal is granted by rule, ordinance, or statute to a higher administrative authority * * *."
 {¶ 37} R.C. 3313.66 refers to the administrative appeals process available pursuant to R.C. 2506.01. However, if another "rule, ordinance, or statute" grants a further administrative appeal from decisions of boards of education or its designee pursuant to R.C. 3313.66, then an appellant must exhaust that administrative remedy before pursuing an appeal to a court of common pleas pursuant to R.C. 2506.01.
 {¶ 38} The Sylvania Board of Education's policy guidelines qualify as an additional "rule" for the purpose of R.C. 3313.66. Neither party disputes that any other additional rules apply. The Sylvania Board of Education's policy section 5611 contains the board's due process procedures. It substantially mirrors the protections contained in R.C. 3313.66, and states in relevant part, "Due Process Rights: When a student is being considered for an out-of-school suspension by the Superintendent, principal, or other administrator:
 {¶ 39} "1. The student will be informed in writing of the potential suspension and the reasons for the proposed action.
 {¶ 40} "2. The student will be provided with an opportunity for an informal hearing to challenge the reason for the intended suspension and the explain his/her actions.
 {¶ 41} "3. An attempt will be made to notify parents or guardians by telephone if a suspension is issued.
 {¶ 42} "4. Within one (1) school day of the suspension the Superintendent, principal, or other administrator will notify the parents * * *. The notice will include the reasons for the suspension and the right of the student, parent * * * to appeal to the Board or its designee.
 {¶ 43} * * *
 {¶ 44} "Appeal of Suspension to the Board or its Designee: * * * The procedure to pursue such an appeal will be provided in regulations approved by the Superintendent. * * *
 {¶ 45} "Appeal to the Court: Under Ohio law, appeal of theBoard's or its designee's decision may be made to the Court of Common Pleas." (Emphasis added.)
 {¶ 46} Pursuant to the passing of authority from the Sylvania Board of Education's Policy, the Superintendent for Sylvania City School District has instituted regulations addressing student rights and appeal procedures in suspension actions. Therefore, the Superintendent's regulations are an "additional rule" for appeals pursuant to R.C. 3313.66. The relevant section, 5611, provides due process and appeal procedures for "major disciplinary actions." A "major disciplinary action" includes expulsion, suspensions, and reassignments. It states in relevant part, "Due Process in a Major Disciplinary Action: * * * B. Procedure: Whenever an incident occurs that may lead to the imposition of a major disciplinary action, the principal or assistant principal must take the following steps: 1. Written Notice. Prior to any discussion with a student that may lead to a major disciplinary action, the school administrator must give the student a written notice of intent to remove, suspend or reassign. 2. Informal Hearing. Unless the student is unavailable or unwilling to discuss the incident with the school administrator, the student shall be given an opportunity to be heard with respect to the alleged offense. 3. Decision. The decision to impose a major disciplinary action may only be made after written notice and informal hearing." (Emphasis added.)
 {¶ 47} The Superintendent's regulations also nominate the Board of Education's designee. Section 5611(5)(d) states that notice of the suspension shall include "the right to appeal the decision to the Board of Education's designee: The Director of Student and Community Services." The Director of Student and Community Services is also the de facto hearing officer for all appeals of suspensions, pursuant to the same regulation. "Appeal hearings shall be conducted by the Director of Student and Community Services * * *" Superintendent's regulations Section 5611(6).
 {¶ 48} Appellee argues that appellant was given an opportunity for a further administrative appeal through a notice contained in the hearing officer's appeal decisions. Both reports contained the following language. "You the parent and/or adult student have the right to appeal the decision of this Appeal Officer to the Superintendent." The appeal decisions contain no other language notifying a student or parent of any other appeal right.
 {¶ 49} The appeal decision states that appellant may have an additional appeal with the Superintendent. However, this does not thereby render the additional appeal language an "order" pursuant to R.C. 2506.01 from which an appeal is granted by "rule, ordinance or statute to a higher administrative authority." In other words, just because a parent is permitted, in an appeal decision, an avenue to pursue another appeal, does not mean that the permission qualifies as a "rule" which a parent must follow. If appellee's logic were followed, then any appeal process contained in any student's particular appeal decision would bind the parent to a procedure outside of that proscribed by the statute, the board's policy, and the superintendent's regulations. Having used its authority granted by statute to dictate an appeal procedure, the board cannot change that procedure in particular cases. (R.C. 3313.66 directs appeals to the Board of Education or its designee.) Appellant followed the procedure set forth by the board's policy, which referred her to regulations promulgated by the superintendent. The superintendent designated the Director of Student Services (in this case Carl Schultz), as the board's designee for appeal purposes. Carl Schultz heard this appeal and acted as hearing officer. Therefore, appellant fully exhausted her administrative remedies according to R.C. 3313.66.
 {¶ 50} We may now consider whether Adam's first suspension comported with due process. The court of common pleas, considering the administrative record, affirmed the suspension decision as having complied with due process. The court of common pleas reviews appeals from Boards of Education pursuant to the standard set forth in R.C. 2506.04. The court of common pleas must affirm the board's administrative decision unless the decision is "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." Id. However, a further appeal of a prior administrative decision to the court of appeals is more limited. An appellate court is required to affirm the decision of the court of common pleas unless it finds as a matter of law that the decision is unsupported by a preponderance of reliable, probative and substantial evidence. Kisil v. Sandusky (1984),12 Ohio St.3d 30, 34.
 {¶ 51} Although Goss v. Lopez described the types of notice and hearings that a student must be given as minimal and informal, one overriding component of due process requires that notice must be given before or contemporaneously with a hearing. "We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the studentfirst be told what he is accused of doing and what the basis of the accusation is." Goss v. Lopez, 419 U.S. at 582 (emphasis added).
 {¶ 52} Biglin testified that the after-school telephone conversation with Adam was meant to be the informal hearing required. He further testified, and appellee's brief also states, that Biglin did not mention any possibility of suspension or that he was considering suspension before or during the phone conversation with Adam. Immediately after concluding his telephone conversation with Adam, Biglin orally informed appellant that Adam was suspended. Although Goss v. Lopez
requires oral notice of the possibility of suspension, R.C.3313.66(A)(1), the Board's policy Section 5611, and the Superintendent's regulations all require the notice to bewritten. The appeal decision contains the conclusion that "Mr. Biglin's attempt to give Adam his informal hearing was satisfied when Adam expressed his involvement per phone call home/Mrs. Grine listened on separate phone." However, not only does this conclusion fail to comport with the minimum standards in Goss,
it also contradicts R.C. 3313.66's requirement that written
notice be given to the student of the proposed suspensionbefore the decision to suspend is enacted.
 {¶ 53} A recent appellate decision, Smith v. Revere LocalSchool District Board of Education (May 9, 2001), 9th Dist. No. 20275, held that the written notice requirement of R.C. 3313.66
was satisfied where the principal hand-delivered a written notice of intended suspension to a student in school, then afforded the student an informal hearing at which the student could explain her version of events. The transcript of Adam's administrative hearing, as well as the decision, reflect an opposite sequence of events. Two documents submitted into evidence, one entitled, "Notice of Intended Suspension," and the other "Parental Notification of Student Suspension," corroborate the chronology. Both documents are not only dated February 11, 2003, but both are signed by office workers with the same time of day, 4:07 p.m. Thus, the evidence demonstrates that these documents were presented to appellant only after the telephone conversation with Adam that Biglin intended to equal the "informal hearing."[3]
 {¶ 54} Although courts may not use their judgment to rewrite or amend policies of the boards of education in this state absent a clear abuse of discretion or violations of law, see e.g.,Cross v. Princeton City School Dist., Bd. of Education (1989),49 Ohio Misc. 2d 1, 2, courts may hold a board of education to the rules that it promulgates within its authority granted from the Ohio legislature in order to comport with due process demands. The hearing transcript, including Biglin's admissions, and the documents submitted into evidence, collectively demonstrate that the trial court's decision is unsupported by a preponderance of reliable, probative and substantial evidence. The substantial evidence demonstrates that appellee failed to follow state law and its own policies enacted pursuant to its authority under state law. Further, that Ohio due process and appellee's policies require written notice prior to an informal hearing is not "a matter of semantics" as Carl Schultz, the hearing officer, told appellant in the hearing. Since these violations effectively deprived Adam of due process, the trial court should have ordered the February 11, 2003 suspension expunged. Appellant's first and second assignments of error are well-taken with respect to the February 11, 2003 suspension decision.
 The Second Suspension {¶ 55} Appellant initially alleged, and continues to argue, that Adam's behavior which prompted the suspensions was provoked by school personnel's failure to provide the modifications and supports as required by Adam's IEP. During appellant's administrative appeal hearing she requested a determination of whether the suspensions were warranted given the modifications in Adam's IEP. The hearing decision reflects that appellant also asked for a manifestation determination, but the decision did not address the request.
 {¶ 56} Since the March 11, 2003 suspension occurred after Adam had been removed from his current education placement more than ten academic days in the 2002-2003 school year, the suspension constitutes a "change of placement" and falls underneath the provisions of the IDEA. See discussion, supra. Therefore, R.C. 3313.66 does not apply. We first examine whether appellant exhausted her administrative remedies in appealing the suspension pursuant to the IDEA and applicable Ohio regulations. If appellant has exhausted her administrative remedies or if appellant has demonstrated by the preponderance of the evidence that exhaustion of the administrative process would be futile, see Honig v. Doe and discussion, supra, then we may proceed to evaluate whether the trial court correctly affirmed the hearing decision upholding the suspension.
 {¶ 57} As Farrin v. Maine School Admin. Dist., supra, describes, there are three basic additional procedural safeguards once a disciplinary action constitutes a change of placement under the IDEA. First, parents must receive, on the same day the decision is made, written notice of the decision and notice of procedural rights. 20 U.S.C. 1415(k)(4)(A)(i); 34 C.F.R. 300.523(a)(1); O.A.C. 3301-51-05(D). The procedural rights include the right to appeal to a hearing officer and an impartial hearing, and the subsequent right to institute a civil action. Id. at 1415(d)(2). Second, the student must receive an alternative education setting during the change of placement that will continue to allow the student to progress in the curriculum. This includes receiving services and modifications described in the student's IEP (in Adam's case, including a full-time paraprofessional). Id. at 1415(k)(3)(B). Third, within ten days of the change of placement (the eleventh day of removal), the IEP team must meet to determine whether the behavior was a manifestation of the student's disability (a "manifestation determination"). Id. at 1415(k)(4)(A)(ii); 34 C.F.R. 300.523(a)(2). Parents also have the right to appeal the result of the manifestation hearing to an impartial hearing officer. Id. at 1415(k)(6).
 {¶ 58} Finally, if a parent appeals or continues to appeal a decision to change placement, for disciplinary reasons or otherwise, a "stay put" provision ensures that the student will not be deprived of his "current educational setting." Id. a 1415(k)(7). See Honig v. Doe (1988), 484 U.S. 305, holding that the "stay put" provision intentionally contains no "dangerousness" exception allowing school officials to unilaterally change a student's placement during appeal of a disciplinary measure that constitutes a change of placement. School officials have the burden of demonstrating, for purposes of injunctive relief from the stay put provision, that the current placement is "substantially likely to result in injury to the student of others" before implementing a disciplinary measure constituting a change of placement. Id at 327.
 {¶ 59} A disciplinary action which constitutes a change of placement cannot occur prior to an IEP meeting and a manifestation determination. 34 C.F.R. 300.524(a) states in relevant part, "If the result of the review described in 300.523 [manifestation determination] is a determination that the behavior of the child with a disability was not a manifestation of the child's disability, the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner in which they would be applied to children without disabilities, except as provided in 300.121(d)." (Emphasis added.) School officials and the IEP team are required, therefore, to hold a manifestation determination prior to
imposing any discipline that would constitute a removal. If the result of the manifestation determination is that the behavior was not a result of the student's disability, then the procedures of R.C. 3313.66 would apply.
 {¶ 60} Additionally, a parent may appeal the manifestation determination through an expedited hearing process. 34 C.F.R. 300.525. The "stay put" provision also applies during the pendency of such an appeal, in order to ensure that a disabled student is not deprived of his current educational placement. Id. at 300.526(a). Changes to the child's current educational placement can only be made if the parent(s) and the State or local agency can agree otherwise. Id.
 {¶ 61} We reiterate that, absent a showing that exhaustion of the administrative process would be futile or inadequate, Honigv. Doe, parents and guardians [must] use the state process which the act specifies shall be provided to them. Crocker,873 F.2d at 935. Chapter 3301-51 of the Ohio Administrative Code enacts the federally mandated minimum requirements at the state level, and goes beyond by adding additional due process requirements. First, a parent or guardian may request a due process hearing upon a proposed change of placement (which this suspension constituted). O.A.C. 3301-51-08(B). There is no time limit specified under which a parent must appeal, but it must be requested in writing to the superintendent of the school district. Id. at (C). The request must remain confidential. Id. Upon receipt of the request, the superintendent must, among other things, send a copy to the Ohio Department of Education, inform the parent in writing of any free or low-cost legal services available, and provide the parent with a copy of the procedural safeguards (discussed supra), along with sources for the parent to contact to obtain assistance in understanding the safeguard provisions. Id.
 {¶ 62} Second, the hearing officer selected must be an attorney licensed to practice law in Ohio who has completed state-required mandatory training, and he may not be an employee of "any public school district or agency that is involved in the education or care of the child under consideration." Id. at (E). The hearing officer is required to inform the parties in a due process hearing of certain enumerated rights. Id. at (F). A final decision of the issues must be reached within 45 days of the receipt of request for a hearing. Id. at (G). Any party may appeal the hearing officer's decision to the State Board of Education within 45 days of the decision. Id. at (H). The right to further appeal to a court from the State decision is then granted. Id. at (I). The school must also continue providing services necessary to enable the student to progress in the general curriculum. O.A.C. 3301-51-05(K)(5)(a).
 {¶ 63} Appellant encountered several contradictions in the process with which she was provided. First, appellant was deprived of an opportunity to pursue IDEA-mandated administrative remedies when Biglin did not provide appellant with notice of procedural safeguards before enacting the suspension. O.A.C. 3301-51-05(D)(1)(e) states, "A copy of the procedural safeguards notice shall be given to the parents of a child with a disability at a minimum * * * upon a change in placement for disciplinary action." There is no evidence that appellant was provided with notice of her procedural rights under the IDEA to appeal this suspension.
 {¶ 64} Appellant argued that appellee was required to hold a manifestation determination, and her initial administrative appeal was based in part on the failure to provide it. Appellant's letters to Carl Schultz, the Board of Education and Superintendent's appointee for disciplinary appeals, and the appeal decision demonstrate that appellant raised the issue, but Schultz refused to address it in the administrative hearing. The manifestation determination issue was not mentioned in the "conclusions" section of the appeal decision.
 {¶ 65} Indeed, Schultz, acting as hearing officer, stated in the hearing in response to appellant's contention that the IEP issue was not "germane." He further stated, "the reason why we're here is because of the due process which you are saying is that the basis of the appeal or your position is that Biglin did not have a proper informal hearing with Adam [sic]." The evidence shows, and the appeal decision corroborates, that appellant requested that a manifestation determination be held. She had written her requests to Biglin, to Carl Schultz as Director of Student Services, to the Superintendent, and to the Sylvania Board of Education. The hearing decision repeated the notice of appeal rights contained in the first suspension hearing report, which directed appellant to appeal to the Superintendent. However, during the hearing, Mr. Carl Schultz stated that appellant could appeal the decision within ten days to the Board of Education.[4]
 {¶ 66} The manner in which the second suspension appeal was conducted also illustrates appellant's difficulty in further pursuing administrative appeals. An impartial due process hearing may be requested any time the school district "proposes to initiate or change to * * * educational placement of the child with a disability." O.A.C. 3301-51-08. This hearing must be requested in writing to the superintendent of the school district. Appellant wrote several letters, dated March 16 and March 24, 2003, to the Superintendent, Lester Schultz, requesting a due process hearing. On April 10, 2003, appellant again wrote the superintendent notifying him that she had requested mediation with the Ohio Department of Education, for alleged retaliation against Adam for the first due process request and failure to provide Adam with FAPE. The hearing that was provided was not held until June 10, 2003, in direct contravention of O.A.C. 3301-51-08(G).[5]
 {¶ 67} In light of the failure to grant appellant the requested manifestation determination, the treatment of this suspension as an appeal pursuant to R.C. 3313.66 without considering Adam's status under IDEA, and the delay between appellant's initial appeal request on this suspension and the June 10, 2003 hearing date, combined with the lack of notice appellant had of her rights under the IDEA, the trial court should have remanded the appeal to the hearing officer with directions to give appellant notice of her procedural rights pursuant to IDEA regulations. Appeal of this suspension must first occur within the specifications of O.A.C. 3301-51-08. Then, a further administrative appeal to the State Board of Education is provided pursuant to O.A.C. 3301-51-08(H). It is within the court's authority to order continuations of the administrative appeal process, even though appellant did not exhaust her administrative remedies, where the appellant had inadequate notice of the proper appeal procedure. See Doe v. Smith (1989),879 F.2d 1340, 1344, which ordered the district judge to return the case to the hearing officer once the procedural defect was uncovered.
 {¶ 68} Although appellant's deprivation of procedural rights pursuant to IDEA and state regulations is clear, we cannot determine the substantive issues on the merits, since no appropriate administrative record has been compiled and O.A.C. 3301-51-08 provides for an appeal to the State Board of Education's Office for Exceptional Children. That agency is in a more appropriate position to evaluate the procedural shortcomings that occurred, and to correct the deficiencies in appellee's compliance with state and federal mandates. Although appellant had not exhausted her administrative remedies, she was clearly precluded from doing so by the failure of appellee to give IDEA-required notices. Therefore, the trial court should have ordered the proper administrative procedures to continue, preserving appellant's state appeal.
 {¶ 69} For the foregoing reasons, the order of the trial court is hereby reversed with respect to the first suspension. Appellee is ordered to expunge the first suspension from Adam's records. With respect to the second suspension, the order of the trial court is hereby reversed, and that cause is remanded for further proceedings consistent with this decision and judgment entry, and a consideration of whether attorney fees, costs, and bad faith damages are proper. Costs associated with this appeal to appellee. App.R. 24.
Judgment Reversed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Knepper, J., Pietrykowski, J., Singer, J. concur.
[1] Asperger's Syndrome is a high-level functioning variation of autism. Core features of Asperger's Syndrome include lack of social skills, extreme impulsivity, sensitivity to stimuli, low self-esteem, inability to understand another's point of view, and obsessive-compulsive behavior. See Bauer, Stephen, M.D., "Online Asperger Syndrome Information and Support" athttp://www.udel.edu/bkirby/asperger. Professionals caring for children with Asperger's are urged to recognize that comprehensive intervention is needed to address an AS child's "social disability" as a "curriculum need and not as punishable, willful behaviors deserving suspensions or other disciplinary measures that in fact mean very little to them, punish them for their disability, and only exacerbate their already poor self-esteem." Klin, Ami et. al., Asperger's Syndrome. Guilford Publications, p. 343 (2000).
[2] Merriam Webster's defines "dismiss" as "to permit or cause to leave; to remove from position or service." (10th ed.)
[3] ring the administrative hearing, Biglin expressed his doubts as to whether Adam was capable of understanding any notice of intended suspension that he might have given. However, since the IDEA allows state law applicable to non-disabled students to apply to suspensions that do not constitute a change of placement, R.C. 3313.66 governs in this instance. Further, since R.C. 3313.66 does not include provisions requiring consideration of disabled students, Biglin's contention is irrelevant. If anything, Biglin's suggestion that Adam could not comprehend the possibility that suspension would be imposed as a consequence implies that more, not less, due process should have been given. Any other construction of these facts would imply that a student's disability may be an excuse to depart from due process requirements. See Goss v. Lopez, noting that "in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required."419 U.S. at 584.
[4] This contradiction is especially apparent in light of the Board's policy and Superintendent's regulations nominating Mr. Carl Schultz as the Board's designee in major disciplinary actions, and further ignores the additional state-level appeals provided for when the IDEA is implicated.
[5] Moreover, it is debatable whether Mr. Carl Schultz qualifies as an appropriate impartial hearing officer for hearings pursuant to O.A.C. 3301-51-08(E), since none of the requirements of impartial hearing requirements pursuant to that Code chapter were given.